FILED
6/23/23 4:34 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

```
                    UNITED STATES BANKRUPTCY COURT
                  WESTERN DISTRICT OF PENNSYLVANIA

IN RE:                     .      Case No. 22-20823-GLT
                           .
                           .
U LOCK INC,                .      5414 U.S. Steel Tower
                           .      600 Grant Street
                           .      Pittsburgh, PA 15219
           Debtor.         .
                           .      June 5, 2023
. . . . . . . . . . . . ..        12:02 p.m.
```

TRANSCRIPT OF #398 EMERGENCY MOTION TO STAY SUBPOENA HEARING OR
   REQUEST FOR EXPEDITED HEARING FILED BY USAAG SYSTEMS CO.

BEFORE HONORABLE GREGORY L. TADDONIO
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:            Law Office of J. Allen Roth
                           By:  J. ALLEN ROTH, ESQ.
                           805 S. Alexandria Street
                           Latrobe, PA 15650

For Christine Biros:       Bernstein-Burkley, P.C.
                           By:  STUART C. GAUL, JR., ESQ.
                           601 Grant Street, 9th Floor
                           Pittsburgh, PA 15219

TELEPHONIC APPEARANCES:

For USAAG Systems Co.:     Santicola, Steel & Fedeles, P.C.
                           By:  MICHAEL F. SANTICOLA, ESQ.
                           722 Turnpike Street
                           Beaver, PA 15009


ECRO:                      Hayley Smith

 Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311      Fax No. (609) 587-3599**

TELEPHONIC APPEARANCES (Cont'd):

For Shanni Snyder:          The Lynch Law Group LLC
                            By:  JOHN PATRICK LACHER, ESQ.
                            501 Smith Drive, Suite 3
                            Cranberry Twp, PA 16066

                                 - - -

3

 1              ECRO:  Court may now come to order.  The Honorable
 2  Gregory L. Taddonio presiding.
 3              THE COURT:  All right.  Good afternoon, everyone.
 4  This is the United States Bankruptcy Court for the Western
 5  District of Pennsylvania and this is the time set for a hearing
 6  on Case Number 22-20823, U LOCK INCORPORATED.
 7              I'll begin by taking appearances.  I'll start first
 8  with the moving party, USAAG Systems Company.
 9              MR. SANTICOLA:  Your Honor, Michael Santicola on
10  behalf of USAAG.
11              THE COURT:  All right.  Mr. Santicola, if you can
12  just speak up because you're coming across rather faintly.  I
13  don't know if you've got anything obstructing your microphone,
14  or at least move closer to your microphone when you are
15  addressing the Court.  That would be appreciated.
16              MR. SANTICOLA:  I will do that, Your Honor.
17              THE COURT:  Thank you.  All right.  I will take
18  appearances for the responding parties.  First, Christine
19  Biros.
20              MR. GAUL:  Your Honor, Stuart Gaul of
21  Bernstein-Burkley on behalf of Ms. Biros.
22              THE COURT:  All right.  Good morning -- or good
23  afternoon.
24              MR. GAUL:  Good afternoon.
25              THE COURT:  All right.  And then I'll take a

1  appearance for responding party Shanni Snyder.

2          MR. LACHER:  Good morning, Your Honor.  John Lacher

3  on behalf of Shanni Snyder.

4          THE COURT:  All right.  And I'll take additional

5  appearances, although there's no other parties that filed

6  responsive documents, but I'll start here in the courtroom.

7          MR. ROTH:  Allen Roth on behalf of U LOCK.

8          THE COURT:  All right.  Good afternoon.

9          MR. SNYDER:  George Snyder.

10         THE COURT:  All right.  Good afternoon.

11         And is there anyone else on the Zoom call who wishes

12 to enter an appearance?

13                       (No audible response)

14         THE COURT:  All right.

15         This is a Hearing on a Request to Stay a Subpoena or

16 Request a Protective Order with respect to a Subpoena that was

17 issued to Citizens Bank requesting account information for a

18 bank account held by USAAG, a non-party to this Bankruptcy

19 action.

20         I've got responses in opposition by USAAG, and a

21 joinder from Shanni Snyder.

22         I've had an opportunity to review the papers, and I

23 have made some initial impressions on this and, quite frankly,

24 I need some clarification or explaining from Ms. Biros' side on

25 this because I can tell you, I'm not really seeing the

1  relevance of this.

2          This seems like a significant overreach, and based on

3  what I understand this Subpoena to be related to, which is the

4  Evidentiary Hearing that I have scheduled on Shanni Snyder's

5  Claim and the Objection to that Claim, I have no clue or

6  concept of how this remotely relates to that.

7          So, I'm inclined right now to grant the Motion and

8  issue a Protective Order, and tell me why I am wrong in

9  reaching that conclusion.

10          MR. GAUL:  Your Honor, the issue before you at that

11  Hearing is going to be whether Ms. Snyder's Claim is fraudulent

12  or is false.  Whether her Claim that she worked the hours, the

13  60 hours a week, seven days a week for five years that she

14  claims to have worked is actually true.

15          We, of course, maintain that she did not do that

16  work.  As Your Honor is aware, we have in the past pointed to

17  documents that Ms. Snyder herself has filed under penalty of

18  perjury with this Court.

19          But we've also contended for months that one of the

20  motivations for Ms. Snyder to make these claims is that there

21  is a larger agreement going on among Ms. Snyder, her brothers

22  who are the managers of U LOCK, and potentially other persons,

23  with regard to the purpose for this.  And that the real purpose

24  of Ms. Snyder's Claim --

25          THE COURT:  Okay.  So, that's all related to your

1 | RICO Claim that's pending.

2 |         MR. GAUL:  That is related to a RICO Claim, Your

3 | Honor, but it's also related --

4 |         THE COURT:  And you're counsel to the RICO Claim,

5 | right?

6 |         MR. GAUL:  That's correct, Your Honor.  But it is

7 | also related here.

8 |         THE COURT:  Okay.  So, should I draw any significance

9 | to the fact that you are here arguing this Motion and not the

10 | Bankruptcy counsel that's been here on prior instances?

11 |         MR. GAUL:  I don't think you should, Your Honor.  I

12 | think in some respects I'm here because I was the last person

13 | stuck in the office on the Friday before Memorial Day.

14 |         THE COURT:  Okay.

15 |         MR. GAUL:  But there is no question that some of the

16 | information that would come up here would also be relevant to

17 | the RICO proceeding.  There is no question about that.

18 |         THE COURT:  All right.  Well let me start with this.

19 | Whatever I've been saying on this is germane to this

20 | Bankruptcy.  I'm not making any determination as to whether

21 | it's relevant in the RICO action.  It may very well be relevant

22 | in the RICO action.  But I'm questioning how it was issued in

23 | this case and has any bearing to this case whatsoever.  Because

24 | if you were operating under the guise of credibility, well that

25 | seems to open up Pandora's Box and you could ask for whatever

7

1 │ you want.

2 │         MR. GAUL:  Right.  But in this situation, Your Honor,

3 │ we're dealing with a case in which USAAG has actually in this

4 │ case offered money both to U LOCK and to Ms. Snyder, which

5 │ raises a logical inference that if there is some sort of

6 │ conspiracy, which we think would make it less likely that Ms.

7 │ Snyder actually performed the work she claims, if there is a

8 │ conspiracy then somehow there must be some connection between U

9 │ LOCK offering money to both the Debtor and the person with the

10 │ Claim against the Estate who purchased the assets of the

11 │ Estate.

12 │         Under this situation we did take a measured approach

13 │ to see what was going on.  We issued, as Your Honor is aware,

14 │ the first Subpoena just to find out a little bit more

15 │ information, if we could, about one of the U LOCK accounts.

16 │         THE COURT:  All right.  Let me stop you there.

17 │ "Measured approach" was your words.  And I'm aware that there

18 │ has now been a new Motion to Quash a Subpoena and seek a

19 │ Protective Order with respect to a Subpoena that your office

20 │ issued to the Catholic School System for records involving Ms.

21 │ Snyder's son.

22 │         MR. GAUL:  All we're looking for in that, Your Honor,

23 │ is whether, in fact --

24 │         THE COURT:  Well, let's start with that.

25 │         MR. GAUL:  Sure.

**WWW.JJCOURT.COM**

Case 22-20823-CLC-Tv-00294-RJC Filed 06/23/256-E Entered 06/23/23 16:56:25 Page 25 of 22 Desc Main
Document    Page 8 of 23

8

1    THE COURT:  How is that measured?

2    MR. GAUL:  Well, first of all, let me back up because

3 the specifics of the Subpoena are that we asked for information

4 that she filed -- we asked for information with regard to any

5 financial aid applications that she filed.  And our concern

6 with that is that what we wanted to see --

7    THE COURT:  You're looking for information about

8 where he lives?

9    MR. GAUL:  I'm sorry?

10    THE COURT:  You're looking for information on where

11 he lives?

12    MR. GAUL:  I think we're looking for information, we

13 may have been looking for information on her addresses.  I

14 don't recall that we were looking for information on his.

15    THE COURT:  Documents sufficient to show the

16 residence of any of the minor children at any time during the

17 requested period.

18    MR. GAUL:  Your Honor, we're also in that course of

19 that looking for information about financial aid applications

20 because those are going to show whether she claimed that she

21 was working during that period.  And I understand Your Honor's

22 concerns about overbreadth on that Subpoena.

23    THE COURT:  Oh, I think we're way beyond overbreadth

24 now.  I think the wheels have completely fallen off on this.  I

25 mean, going after the minor child of a party in this litigation

1 is beyond the pale.

2          MR. GAUL:  But, again, Your Honor, we're not -- and I

3 understand that, but we still think that the financial aide

4 information on that Motion is particularly relevant.

5          THE COURT:  How is that relevant to whether or not

6 she has an allowed Claim?

7          MR. GAUL:  Because her allowed Claim is based on her

8 having a job and performing a job during that period.

9          THE COURT:  Okay.

10          MR. GAUL:  If she asserted --

11          THE COURT:  But her allegation is, she wasn't paid

12 for that job.  So, it actually would seem to be consistent.

13          MR. GAUL:  But the question is, is there --

14          THE COURT:  Now, you've quoted that I've --

15          MR. GAUL:  I'm sorry.

16          THE COURT:  -- I've found Ms. Snyder's Claims and

17 allegations to be quite dubious.  And I have said that, and I'm

18 interested in seeing the proof in support of this Claim.

19          But I've got to tell you, I mean, you're not doing

20 yourself any favors with this stuff.  This is ridiculous.  And

21 again you know if you find information -- let's just go down,

22 and again, this is a Motion that is not even heard in front of

23 me today, but I just --

24          MR. GAUL:  Sure.

25          THE COURT:  I can't get my head around it because

1    it's informative as to there is no limitation on what's being

2    sought at this point in this litigation.  And we've lost all

3    concept of reality of what we're going to try in July.  And I'm

4    starting to think I'm going to have to put some pretty tight

5    guide rails on the parties, or else this hearing is going to

6    get completely out of hand.

7          But you know let's assume for sake of argument you

8    get -- I mean, I'm assuming you must think for some reason that

9    she got some sort of financial assistance through the school

10   system?

11         MR. GAUL:  We think that.  Yeah, we are concerned

12   about that.

13         THE COURT:  Okay.  So, if she did, it seems to be

14   that might be consistent with her allegation that she had a job

15   and wasn't paid for four years.

16         MR. GAUL:  It is, but --

17         THE COURT:  So, I don't know how that helps support

18   your Claim but -- or your defense here.  But, again, I just --

19   I come back to, this is really personal, and beyond what would

20   seem to be any semblance of relevance as to whether or not she

21   worked for U LOCK, whether she actually incurred the hours that

22   she did, and whether she is entitled to the wages that she's

23   asserted.  I just don't see how this moves at all forward in

24   any way.  But, again, that's that Motion.

25         Let's turn back to this Motion.  If there is a

1  conspiracy, you know, again, assuming the facts that you've

2  alleged in the District Court Complaint are true, I still don't

3  know how that has any bearing on whether or not Shanni Snyder

4  has an allowed Claim in this Estate.

5         MR. GAUL:  The question at that point, Your Honor, is

6  who is involved in the conspiracy?  Is there any connection

7  between USAAG on the one hand and Ms. Snyder -- and the

8  property that Ms. Snyder owns in North Huntingdon.

9         THE COURT:  Okay.  But, again, these are all --

10         MR. GAUL:  I'm sorry.  That Ms. Biros owns in North

11  Huntingdon.

12         THE COURT:  Well, these are all RICO issues.  These

13  have nothing to do with the Claim allowance.  You know, I

14  agree, if there is a conspiracy there and these parties are

15  working in concert with each other to cause the involuntary and

16  shift money around and do all these things, that may be

17  perfectly fine in a RICO action, but it doesn't relate to this.

18         MR. GAUL:  But it makes it less likely that she

19  actually did the work that she claims to have done here.  And

20  that's the work that gives rise to both her Claim in this case

21  and her Judgment in the Bankruptcy which she has used in this

22  action, as well.

23         THE COURT:  How many Subpoenas did you issue?

24         MR. GAUL:  I believe two to Citizens Bank and one to

25  the Diocese.

1              THE COURT:  That's it?

2              MR. GAUL:  That is it, that I remember, and when I

3    get back I will check and promptly inform the Court if there

4    are any more.

5              THE COURT:  All right.  Anything further you want to

6    say at this point?

7              MR. GAUL:  Nothing, Your Honor.  Thank you.

8              THE COURT:  Thank you.  Mr. Santicola, anything you

9    wish to raise at this point?

10             MR. SANTICOLA:  Your Honor, I think that the Court

11   understands our position.  And I can, you know, for sake of

12   time just rely on what we've put into our Motion.  You know to

13   me, I'm not sure how you would prove a conspiracy from 2016 to

14   2021 with records from '22 and '23.  I mean, this Motion asks

15   for -- I mean, they want USA -- or my client's confidential

16   commercial information, every financial transaction, every

17   transferee, officer's identification, and signature cards.  I

18   mean, none of that is relevant.

19             So, I think the Court understands our position.  I

20   don't need to talk just for the sake of hearing my voice.  So,

21   you know, we believe the Subpoena should be quashed.

22             THE COURT:  All right.  Thank you.  Mr. Lacher,

23   anything further from you?

24             MR. LACHER:  Yes, Your Honor.  Thank you.

25             I certainly agree with everything Mr. Santicola just

13

1  set forth.

2       I have some additional matters to bring to the

3  attention of the Court which touch on what we're dealing with

4  here today.

5       Your Honor issued an Order regarding the Evidentiary

6  Hearing on Biros' Objection to Ms. Snyder's Claim.  In that

7  Order you specifically wrote, "Matters to be addressed are

8  limited to the merits of Claim Number 1 filed by Shanni

9  Snyder."  You also put that Order that, "Prior to the

10 Evidentiary Hearing the parties shall meet and confer to

11 discuss a resolution of the case."

12      I would suggest, Your Honor, I don't believe the

13 Biros side is adhering to that Order, and I think the Court

14 should know what's going on out here.  And to do that I'd just

15 like to set forth a couple of time lines for you, and I think

16 this will be instructive.

17      As far as the Subpoena time lines, on April 21st I

18 received a copy of something called a Notice of Subpoena.

19 There was no Subpoena attached to it, no reference to USAAG.

20      So, on April 24th I called Attorney Lindsay at the

21 Bernstein Law Office and asked for a copy of the Subpoena

22 itself.

23      On April 26th I sent a follow-up email to Attorney

24 Lindsay regarding my request for the copy of the Subpoena.

25      On May 2nd Attorney Lindsay sent me a Subpoena

1  exhibit, still not the Subpoena itself.  The exhibit makes no

2  mention of USAAG.  It just lists Citizens Bank and account

3  numbers.  So, there's no way for me to tell who the accounts

4  are.

5       I will tell the Court the truth.  I assumed they were

6  somehow U LOCK accounts, and they were trying to track money in

7  and out of U LOCK, but I didn't know.

8       On May 12th we received discovery requests to Shanni

9  Snyder.  In those discovery requests, you know in the beginning

10 we give parties instructions and deadlines, they put in there

11 that we had 14 days to respond to the discovery requests.  I

12 think that's contrary to the Rules.  Of course the Court can

13 order a shorter time or the parties can stipulate to a shorter

14 time, but to unilaterally give a 14-day response period is

15 improper.

16      On May 24th I received a second set of discovery

17 responses to Ms. Snyder and again it provided a 14-day

18 discovery period.

19      On May 26th Mr. Fuchs sent a letter to the Bernstein

20 Office -- Mr. Fuchs being my co-counsel -- objecting to the

21 14-day response time and asking for all Subpoenas to be -- that

22 had been issued, copies of the full Subpoenas.

23      On May 26 copies of Subpoenas were provided, and then

24 that was the first time we saw that they had contacted the

25 Greensburg Catholic School System to get information on Ms.

1  Snyder's minor children.

2         So, I would argue that the discovery that they have

3  set forth in the Subpoenas and, and we'll get to that later in

4  the case, but the requests from Ms. Snyder herself are beyond

5  the scope of discovery, in violation of the Rules, they're

6  late, they're incomplete, and they're improper.

7         As to the other part of your Order, Your Honor.  This

8  is I'll call it the Settlement time line.  I won't get into

9  details of the Settlement, but I want you to know what's going

10  on out here.

11         You issued your Order on April 14th.  On April 17th I

12  got a call from Trustee Slone asking about my willingness to

13  settle the Claim.  I said that I was very much in favor of it

14  because as Mr. Slone explained there was no money in the Estate

15  to pay the Claim anyway.

16         I conveyed to Mr. Slone an offer which Mr. Slone

17  himself, I wish he was on the line, but I've got his consent to

18  say this to the Court, Mr. Slone thought it was a good faith

19  offer and likely to result in a Settlement of the matter under

20  ordinary circumstances.

21         As far as I know, and I don't know, the Bernstein

22  Office never responded to Mr. Slone's reach outs on this

23  Settlement matter.

24         So, after I did a follow-up call to Trustee Slone on

25  April 24th, I called Attorney Lindsay directly and conveyed the

1   offer that I had given to Mr. Slone.

2          Again, on April 26th I followed up with an e-mail

3   seeking an update on my Settlement proposal.

4          By May 12th with me having not received any response,

5   I called Attorney Robert Bernstein directly to inquire

6   regarding the response.  I wanted to make sure it was conveyed,

7   the parties were considering it.

8          To Mr. Bernstein's credit I will say that he

9   responded quickly on May 15th.  That's the good news.  The bad

10  news is the offer was just rejected out of hand, with no real

11  counteroffer, you know it was essentially surrender.  That's

12  the counter offer.

13         On May 31st I called Mr. Bernstein back, and I tried

14  to rekindle the resolution.  I would call that phone call very

15  promising and productive.  We put a lot of details together

16  that might make my Settlement Offer even more attractive.

17         However, later that very same day, I got an e-mail

18  from Mr. Bernstein that kind of disavowed our discussion

19  telling me that he would not be the person to talk to anymore

20  regarding Settlement, and that all future discussions were to

21  be held with Attorney Burkley in the Bernstein Office.

22         On June 2nd I called Mr. Burkley and left a voicemail

23  message.  I have not heard back from him.

24         Your Honor, I will not get into the details of the

25  Settlement, but I will say this at the risk of anyone getting

1   mad at me.  If Your Honor knew what we were willing to do with

2   regard to this Settlement and you heard that Biros was pushing

3   for this hearing, I think the Court would be angry.  And my

4   speculation is that they're keeping this alive simply to do

5   this kind of expansive discovery as Your Honor pointed out to

6   maybe assist in the RICO case or get a head start on it.  So, I

7   just wanted the Court to know.

8           I also asked if they would be willing to go to

9   mediation on this matter, which I think would be completely

10  appropriate.  They, basically, said well if the Court orders it

11  fine, but we're not consenting to it.  So, I tried to get

12  consent to a mediation.

13          Your Honor, this matter should be settled.  There is

14  no money in the Estate.  We've -- you know this is kind of

15  silly and I'm doing everything I can to bring people to the

16  table, and of course the Court can't make people settle, and

17  neither can I.

18          But I will tell Your Honor we're making good faith

19  proposals and getting stonewalled.  So, again, on this matter I

20  agree with USAAG.  I think their Motion is well-filed and

21  that's why we've joined them.  Thank you, Your Honor.

22          THE COURT:  All right.  So, it sounds like there have

23  been meet and confer efforts, it just has not yielded any

24  progress though.

25          MR. LACHER:  Well, I would agree with Your Honor, but

1  you know, it goes like two weeks without a response, I have to

2  follow-up, I have to do this.  I've tried to wrap the Trustee

3  into it.  They haven't talked to the Trustee.  I just think

4  this is -- I know the Court encourages discussions and

5  Settlements.  We're really trying, and I don't believe we're

6  being responded to in total good faith.

7          And again, I have a lot of respect for the Bernstein

8  Firm, Mr. Bernstein.  We had wonderful discussions, but I'm

9  getting nowhere fast, and I just don't think they're following

10  the spirit of your Order, Your Honor.

11          THE COURT:  Well I don't want to get into Settlement

12  discussions.  But what I envision is unique to this is that

13  instead of having a compromise, this goes to an issue of

14  standing that if there is no Claim then there is no standing

15  for the case, and I'm assuming that's why Ms. Biros is taking a

16  tough stand on this, as opposed to being willing to negotiate

17  some sort of resolution or a compromise.  But, again, that is

18  what it is.

19          Bottom line is, this case has never made any logical

20  sense in any dimension.  The assets have simply not justified

21  the amount of time, expense and lawyering that has gone into

22  this case, and this has been a complete disaster on all

23  accounts.

24          And I had thought that I was pretty clear with the

25  parties on my expectations going forward, that I wasn't going

1  to put up with any more nonsense.  I thought I took some pretty

2  strong steps, some strong language as to what the Court was not

3  going to tolerate.

4          And, in fact, I remind everyone I still have two Show

5  Cause Orders that are under advisement that I may have to

6  reevaluate a little bit in light of where we are.  But it seems

7  like the parties' actions has not adjusted in any way.  We are

8  still proceeding down a path of scorched earth that really has

9  no semblance or rational relation to what the issues are that

10  the Court needs to decide.  And you know if my prior warnings

11  weren't strong enough, then perhaps I need to go even further.

12          All right.  Anything else from the parties at this

13  point?

14          MR. LACHER:  No, Your Honor.

15          MR. GAUL:  Nothing, Your Honor.

16          THE COURT:  All right.  Well, here's where I am.  I

17  think this Subpoena, the one that's in front of me today as to

18  the Citizens Bank and the USAAG account, it's RICO discovery

19  disguised as discovery in this Bankruptcy proceeding.  It has

20  no relevance that I can see to the Claim Objection.  I don't

21  know what a conspiracy has to do with whether she has an

22  allowed Claim.  I don't know what information in a third

23  party's bank statement has to do -- a third party bank

24  statement that's several years after the Claim events accrued

25  has any relation to whether or not she has an allowed Claim

Case 2:23-cv-00874-RJC   Document 6-6   Filed 06/28/23   Page 25 of 28
Case 22-20823-GLT   Doc 473   Filed 06/23/23   Entered 06/23/23 16:56:25   Desc Main
Document      Page 20 of 23

20

1  dating back from 2016 to 2020.

2       And this is a Subpoena directed to nine parties.
3  It's just breathlessly over-broad, asking for every transaction
4  that this third party has engaged in.  It just boggles my mind
5  that this could even remotely be considered related to the
6  Shanni Snyder Claim Objection.  And just simply labeling it as,
7  it goes to her credibility, that simply doesn't fly here
8  because that would open the door to anything.

9       So, I am going to grant the Motion, issue a
10  Protective Order, and finding that there is no further
11  obligation for Citizens Bank to respond to the Subpoena, I'm
12  going to Quash the Subpoena.

13       And, relatedly, you know, we can have a Hearing on
14  this Expedited Motion on the Greensburg Diocese Subpoena, but
15  I'm going to caution you that I don't think it's necessary.  In
16  fact, I'm ready to rule on that right now.  I'll give Ms. Biros
17  an opportunity to respond to it, but I'm inclined to just issue
18  a similar Order with respect to that.  Again, you know, if it's
19  relevant to the RICO action that may be different, but it
20  certainly has no place here.

21       And I'm going to require the Bernstein Firm to
22  disclose any and all Subpoenas that have been issued in this
23  Bankruptcy case related to this Claim Objection, and to
24  disclose that within the next seven days.

25       But, again, I want to be crystal clear on this, Mr.

```
 1    Gaul.  This is your first time in front of me on this case, so
 2    you do not have the benefit of hearing it from me.  I'm sure
 3    you've heard it from your colleagues.  But your firm needs to
 4    definitely have a self-introspection on what it's doing in this
 5    case because it's not moving the ball forward for Ms. Biros in
 6    any semblance.
 7              I am continuously engaged in exercises such as this
 8    which are a complete waste of the Court's time, the parties'
 9    time, it's a waste of your client's resources, it's driving up
10    the expense for an Estate that has no value to it.  And you
11    know I've got to be candid, I think this is doing damage to
12    your firm's reputation.
13              I don't know if this is being internally generated by
14    your firm or if it's at the insistence of your client, but
15    think long and hard about what this is going to do to your firm
16    long-term in view of credibility and reasonableness because
17    this is certainly not a measured approach.  This is scorched
18    earth.  This is beyond the pale.
19              And as I said, I issued a Rule 11 Opinion before and
20    if that didn't dissuade folks from going down this path, then
21    you know I can't apologize for what might happen next.
22              MR. GAUL:  Understood, Your Honor.
23              THE COURT:  All right.  Mr. Lacher raised the issue
24    about the meet and confer.  Again I would encourage the parties
25    to continue to work together, but I'm not holding out any hope
```

1   that that's going to resolve in any true Settlement.  I could

2   be proven wrong, but the parties are just too entrenched and

3   hate each other too much to do that.

4        And the other thing I would just advise the parties.

5   I think it's clear from how we're proceeding, but I want to

6   make sure Mr. Lacher is aware of this.  I had mentioned this

7   before in a prior hearing.  But I know there's been the Motion

8   to Withdraw the Reference as to the Claim Objection, and that's

9   being transmitted to the District Court, and the District Court

10  will hear that when it hears it.

11       But, in the meantime, I just want to make sure we're

12  clear.  I still intend to proceed forward until the District

13  Court rules on that Motion.  So, there's no misconceptions from

14  the parties on how we're going to proceed, is that understood?

15       MR. LACHER:  One hundred percent, Your Honor, it's

16  understood.  And as you know, I brought this up at the last

17  hearing, it's limited to this matter, and it's only because the

18  District Court held it in the first place, and I hope the Court

19  doesn't take it as any kind of sleight.  It's absolutely --

20       THE COURT:  I have pretty thick skin when it comes to

21  this stuff.

22       MR. LACHER:  I believe that's where it should be.

23       THE COURT:  So, I don't take it that way, and the

24  parties are entitled to exercise whatever rights they wish to

25  exercise.  But where I do take personally is that the parties

1  do not heed the warnings and statements that I've given time

2  and time again on this case.  So I want this message taken back

3  to your firm, Mr. Gaul.  This is not acceptable tactics.  This

4  is not how I expect these cases to proceed.  And this does

5  nothing to move the case forward.

6        All right.  So, with that, I will issue an Order to

7  the effect for the reasons stated on the record here today and

8  we'll see how things unfold in the coming days.  Unless there's

9  anything else, parties?

10        MR. SANTICOLA:  No, Your Honor.

11        THE COURT:  Very good.

12        MR. LACHER:  Thank you, Your Honor.

13        THE COURT:  I will consider this matter to be

14  concluded.  The Court will now stand adjourned and we will

15  close the record.  Thank you, everyone.

16                    * * * * *

17              **C E R T I F I C A T I O N**

18        I, JANET D. PERSONS, court approved transcriber,

19  certify that the foregoing is a correct transcript from the

20  official electronic sound recording of the proceedings in the

21  above-entitled matter and to the best of my ability.

22

23  /s/ Janet D. Persons

24  JANET D. PERSONS

25  J&J COURT TRANSCRIBERS, INC.    DATE:  June 23, 2023